UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NASER HINEITI,                          )
                                        )
            *Plaintiff,*                )
                                        )
        *vs.*                           )       No. 1:20-cv-01369-JMS-TAB
                                        )
ELI LILLY & COMPANY,                    )
                                        )
            *Defendant.*                )

## ORDER

Plaintiff Naser Hineiti was employed by Defendant Eli Lilly & Company ("Lilly") as an

Engineering Advisor.  During his employment, he filed multiple charges of discrimination with

the Equal Employment Opportunity Commission ("EEOC"), complained internally of

discrimination on one occasion, and filed this lawsuit.  Mr. Hineiti alleges that, in retaliation for

taking those actions, he was denied a promotion, placed on a performance improvement plan,

issued a final written warning, and ultimately terminated.  Lilly has filed a Motion for Summary

Judgment, seeking judgment in its favor on all of Mr. Hineiti's claims.  [Filing No. 44.]  That

motion is ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court

what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson*

*v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary

judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v.*

1

*Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. The Beginning of Mr. Hineiti's Employment at Lilly

In June 2014, Mr. Hineiti was hired as an Engineering Advisor in Lilly's Device Development Group, specifically the Delivery and Device Connected Solutions team ("DDCS"). [Filing No. 44-1 at 8; Filing No. 44-1 at 13; Filing No. 59-2 at 2.]  He was 44 years old at the time he was hired.  [*See* Filing No. 44-2 at 2 (listing Mr. Hineiti's date of birth).]  Mr. Hineiti is Palestinian, and he believes that his nationality was common knowledge at Lilly because other employees often asked him about the origins of his Palestinian name.  [Filing No. 44-1 at 35-36; Filing No. 59-2 at 2.]  Initially, Mr. Hineiti was employed at the R4 level.  [Filing No. 44-1 at 75.]  The "R path" is a technical path, and it ranges from level R1 to level R7.  [Filing No. 44-1 at 75; Filing No. 44-3 at 33; Filing No. 44-3 at 43.]

Mr. Hineiti supervised the Product Development Group, which was made up of four to six employees.  [Filing No. 44-1 at 13; Filing No. 59-2 at 2.]  At some point in early 2015, Andy Ratz, a Senior Director, joined DDCS and the department was reorganized.  [Filing No. 44-1 at 14-17; Filing No. 44-2 at 2; Filing No. 59-2 at 2.]  During the reorganization, half of the employees that Mr. Hineiti previously supervised were reassigned to another supervisor, and Mr. Hineiti was no longer included in senior leadership meetings.  [Filing No. 44-1 at 14-17; Filing No. 59-2 at 2.]

### B.  Mr. Hineiti Files his First Charge of Discrimination with the EEOC

On November 5, 2015, Mr. Hineiti filed a charge with the EEOC against Lilly ("the November 2015 Charge"), alleging discrimination based on national origin.  [Filing No. 44-1 at 28.]  Mr. Hineiti testified that he filed that charge because he wanted to signal to Mr. Ratz that he "want[ed] to be treated fairly."  [Filing No. 44-1 at 29.]  Specifically, Mr. Hineiti believed that Mr. Ratz had unfairly taken half of his direct reports, excluded him from senior leadership meetings, prevented him from being involved in important company decisions, and failed to hire him for a director position.  [Filing No. 44-1 at 29-33; Filing No. 44-2 at 2.]  Mr. Hineiti testified that he did not pursue the November 2015 Charge further, and it was ultimately dismissed.  [Filing No. 44-1 at 29; Filing No. 44-1 at 44.]

### C.  November 2015 Employee Relations Complaint Against Mr. Hineiti

On November 19, 2015, a Lilly employee reported to Employee Relations ("ER") that Mr. Hineiti treated her in a threatening and bullying manner.  [Filing No. 44-8 at 8.]  As examples of such behavior, the employee noted that Mr. Hineiti "yell[ed] at project team members, and [used] body language that is intimidating," and intentionally called others by incorrect names.  [Filing No. 44-8 at 8.]  The ER employee investigating the complaint, Casey Cammack, concluded that Mr. Hineiti was "a difficult person to work with," argumentative, and aggressive, but had "not been physical or inappropriate."  [Filing No. 44-8 at 10.]  Ms. Cammack counseled Mr. Hineiti's managers and the other involved employees on how to approach interactions with Mr. Hineiti and how to coach him to improve his behaviors.  [Filing No. 44-8 at 10.]

### D.  Mr. Hineiti's 2015 Year-End Evaluation

In December 2015, Mr. Hineiti's supervisor, Matthew Clemente, completed a year-end evaluation of Mr. Hineiti.  [*See* Filing No. 44-2 at 5.]  Mr. Clemente indicated that Mr. Hineiti

4

"sufficiently met job expectations for the performance period" and gave positive feedback concerning Mr. Hineiti's performance, including the following comment: "I really look forward to working with Naser over the years to come as he continues to take on significant roles developing the organizational capabilities and resources, focuses on finding even more effective ways of driving change and gaining consensus and continues to drive the acceleration of life changing solutions for our patients." [Filing No. 44-2 at 5.]

### E.  January 2016 ER Complaint Against Mr. Hineiti

In January 2016, Mr. Clemente complained to ER that Mr. Hineiti had made an inappropriate comment to a pregnant coworker during a meeting. [Filing No. 44-8 at 14.] Ms. Cammack noted that she had learned during her investigation of that report that Mr. Hineiti's "tone/style has been changing and improved" since the last ER complaint. [Filing No. 44-8 at 14.] However, Ms. Cammack ultimately determined that Mr. Hineiti's comment violated Lilly's code of conduct, and Mr. Clemente provided Mr. Hineiti with "corrective feedback" concerning the incident. [Filing No. 44-8 at 16.]

### F.  Mr. Hineiti Gets a New Supervisor

In early 2016, Mr. Hineiti began reporting to Ronald Iacocca. [Filing No. 44-3 at 17-18.] Sometime thereafter, Mr. Hineiti, Mr. Iacocca, and Mr. Ratz met to discuss Mr. Hineiti potentially working on portfolio projects. [Filing No. 44-1 at 37.] According to Mr. Hineiti, during that meeting, Mr. Iacocca said, "let bygones be bygones." [Filing No. 44-1 at 37.] Mr. Hineiti took that as an indication that Mr. Iacocca knew about the November 2015 Charge and was hoping to put it in the past and move on. [Filing No. 44-1 at 38-39.]

On March 24, 2016, Mr. Iacocca reached out to ER for guidance on how to approach Mr. Hineiti about Mr. Hineiti's transition to Mr. Iacocca's team. [Filing No. 44-8 at 24.] Mr. Iacocca

was concerned that Mr. Hineiti might disagree with the changes in leadership and other organizational changes.  [Filing No. 44-8 at 24.]  Mr. Iacocca also sought advice on how to tell Mr. Hineiti that Mr. Hineiti was being removed as a hiring manager for an upcoming recruiting event because he had previously demonstrated aggressive and abrasive behavior during an interview with a candidate for employment.  [Filing No. 44-8 at 24.]  Mr. Iacocca also reported concerns with Mr. Hineiti's interpersonal skills, noting that others had difficulty working with Mr. Hineiti due to his "abrasive/direct style of communication."  [Filing No. 44-8 at 4.]  Ms. Cammack advised Mr. Iacocca to be honest and transparent with Mr. Hineiti and offer guidance regarding how Mr. Hineiti can build his relationships with others.  [Filing No. 44-8 at 4.]

In a May 2016 series of emails exchanged with another employee, Mr. Iacocca noted that Mr. Hineiti had not "acclimated into the group," that he was "misdirecting another individual," and that "[s]ome of our projects are moving very quickly, and because [Mr. Hineiti] isn't integrated, he appears to be part of the problem, not the cure."  [Filing No. 44-7 at 7.]  Mr. Iacocca also expressed that Mr. Hineiti was applying for another position, without alerting a supervisor, and opined that "we are seeing a lot of stress behaviors."  [Filing No. 44-7 at 7.]  Mr. Iacocca added: "He's determined to become a director, and the more he doesn't achieve his goal, the more outlandish behaviors we see.  All I can say is, Wow."  [Filing No. 44-7 at 7.]  In response, the other employee offered to reach out to Mr. Hineiti directly to address these issues, but Mr. Iacocca told the employee to "hold off for a little," stating: "He is a good guy.  I truly believe that.  He just needs to chill a bit."  [Filing No. 44-7 at 6.]

### G.  Mr. Hineiti's 2016 Year-End Evaluation

In 2016, Mr. Iacocca indicated that Mr. Hineiti "sufficiently met job expectations for the performance period."  [Filing No. 44-2 at 6.]  The evaluation included largely positive feedback,

including a note that "Naser has had a successful year." [Filing No. 44-2 at 6.]  However, the

evaluation also stated the following:

> This feedback is not included in Naser's year end evaluation, but is included for
> completeness.  Matt Clemente, Naser's previous supervisor, felt that Naser did not
> deliver on the objectives that had been established for the first six months of the
> year.  This has been discussed with Naser.  As the feedback was not delivered in a
> timely fashion, it is included for information purposes only.

[Filing No. 44-2 at 6.]  Mr. Hineiti testified that he did not know why Mr. Clemente would have

given that feedback, and that some of the goals Mr. Clemente wanted to achieve were "not within

reason." [Filing No. 44-1 at 46-49.]

### H.  Mr. Hineiti's 2017 Talent Assessment

In 2017, Mr. Iacocca performed a talent assessment of Mr. Hineiti.  [Filing No. 44-3 at 32.]

During that process, a questionnaire was circulated to managerial employees to evaluate Mr.

Hineiti's capability on the technical path (known as the "R path") and the management path (known

as the "M path").  [Filing No. 44-3 at 33; *see also* Filing No. 44-1 at 75.]

Mr. Iacocca compiled the responses from the other employees.  [Filing No. 44-3 at 37.]

The following are some of the comments received during the talent assessment:

- "I have seen [Mr. Hineiti] get upset when colleagues were pushing him on
  an issue." [Filing No. 44-7 at 13.]

- "[Mr. Hineiti] seems very capable, but I have not seen him deliver on
  projects.  He does not adequately addresses [sic] issues within a team and
  does not coach his team in appropriate behaviors and project deliverables."
  [Filing No. 44-7 at 13.]

- "[Mr. Hineiti] has a few technical areas where he is comfortable.  When he
  steps outside those areas, he struggles.  I never hear his name as someone
  who is routinely used by others for help and advice."  [Filing No. 44-7 at
  13.]

- "[Mr. Hineiti] has a strong interest in higher levels of leadership, but I have
  not seen the behaviors that would make him successful in these roles."
  [Filing No. 44-7 at 14.]

7

- "Very motivated to get to the next level as a manager. This has sometimes clouded his ability to perform at his current level. The desire to manage people has led him to be less willing to personally complete tasks. He operates more at the R2 level." [Filing No. 44-7 at 14.]

- "I have not seen [Mr. Hineiti] consistently act strategically on projects. His interpersonal skills in group and individual settings are weak. I have no confidence in his ability to stay calm under pressure." [Filing No. 44-7 at 15.]

- "[Mr. Hineiti] has gone [sic] a good job in leading the PLM team. I am unsure about the level of direction and decision making that was required when ambiguity was encountered." [Filing No. 44-7 at 16.]

- "[Mr. Hineiti] does understand complex issues. Input into PLM has allowed him to demonstrate a commitment to change. He is committed to the success of this project." [Filing No. 44-7 at 16.]

- "[Mr. Hineiti's] style can be perceived as defensive. Over the last year, I have seen improvements in this area." [Filing No. 44-7 at 18.]

- "[Mr. Hineiti] demonstrates significant interpersonal issues." [Filing No. 44-7 at 18.]

All six of the employees who completed questionnaires indicated that Mr. Hineiti did not have M-path potential. [Filing No. 44-7 at 19.] Four employees indicated that Mr. Hineiti's R-Level Potential would be R1-R2, while two employees indicated that his potential was R3-R5. [Filing No. 44-7 at 19.]

An "Assessment readout" record created by Mr. Iacocca indicates that Mr. Iacocca met with Mr. Hineiti to discuss the results of the talent assessment. [Filing No. 44-2 at 7; Filing No. 44-3 at 36-37.] According to Mr. Iacocca's notes, Mr. Hineiti did not internalize the feedback, believed he was working at the appropriate level, did not understand why he was previously removed from a leadership position, and thought that "people were biased against him." [Filing No. 44-2 at 7-8.] Mr. Iacocca advised Mr. Hineiti that he needed to address these issues in 2018,

"work more on portfolio projects, work more on project completion, and develop[] a defined area of expertise." [Filing No. 44-2 at 8.]

### I. Mr. Hineiti's 2017 Year-End Evaluation

In 2017, Mr. Iacocca indicated that Mr. Hineiti "had an acceptable year" and "sufficiently met job expectations for the performance period." [Filing No. 44-2 at 9-10.] The evaluation contained some positive feedback, but noted that: "In moving forward with 2018, Naser will need to address a few issues as an R4 Engineering Advisor. He needs to work on portfolio projects in addition to [product lifecycle management], and efforts will begin early in January to identify a project and follow it to completion." [Filing No. 44-2 at 10.]

Mr. Iacocca testified that he "tried diligently to get portfolio projects for Mr. Hineiti." [Filing No. 44-3 at 28.] Specifically, he proposed Mr. Hineiti's name to project managers and made those individuals aware that Mr. Hineiti was available to work on projects. [Filing No. 44-3 at 28.] According to Mr. Iacocca, many of these individuals "just politely declined," but some of them said that Mr. Hineiti "was seen as divisive" and that they did not believe "that his interpersonal skills were sufficient to work harmoniously on projects." [Filing No. 44-3 at 29.] Mr. Hineiti, on the other hand, maintains that Mr. Iacocca and Mr. Ratz continued to refuse to give him portfolio assignments. [Filing No. 44-1 at 68-69.]

### J. Mr. Hineiti's 2018 Application for a Promotion

In 2018, Mr. Hineiti applied for a promotion from an R4 level position to an R5 level position. [Filing No. 44-3 at 54.] As a part of the promotion application process, candidates are required to create dossiers explaining their contributions to technical projects and demonstrating their qualifications. [Filing No. 44-3 at 53-54.] The dossier is then submitted to a Titles Team for "pre-voting," during which the team members review the dossier, provide questions and feedback

9

for the candidate, and cast an initial, nonbinding vote regarding the application.  [Filing No. 44-3 at 56-59.]  After the candidate is given the opportunity to address the feedback, the Titles Team holds a discussion and casts a final vote.  [Filing No. 44-3 at 59.]

Mr. Iacocca assisted Mr. Hineiti in preparing his dossier for his application.  [Filing No. 44-3 at 52.]  Dave Collins, a senior research fellow, also assisted Mr. Hineiti in preparing his dossier.  [Filing No. 44-3 at 53-52.]  Notes from the Titles Team's discussion show that nine team members voted against Mr. Hineiti receiving a promotion, and no team members voted in favor of the promotion.  [Filing No. 44-4 at 7.]  The Titles Team concluded that Mr. Hineiti "was too directive," and although he was "doing great work," he "couldn't articulate the value proposition," and "needs to connect to the business case and the bigger picture and communicate that broadly." [Filing No. 44-4 at 7.]  The Titles Team further noted that Mr. Hineiti "[c]an get to R5, but needs to address some of the style things (very passionate, can get loud and boisterous)."  [Filing No. 44-4 at 7.]  The Titles Team also indicated that Mr. Hineiti "suffers from keeping it close to the vest" and "could reach more across boundaries."  [Filing No. 44-4 at 7.]

### K.  Mr. Hineiti's 2018 Year-End Evaluation

In 2018, Mr. Iacocca indicated that Mr. Hineiti "sufficiently met job expectations for the performance period."  [Filing No. 44-2 at 13.]  Mr. Iacocca also provided the following feedback:

> To achieve success on [certain] projects, Naser will have to adopt a broader communication and expectation plan.  Many people, particularly on the DDCS lead team, are unaware of these efforts and the progress being made.  As a result, it creates competing efforts on the PITT team.  In a recent meeting, I was the only person who had any working knowledge on what he was trying to achieve . . . .
> Additionally, I also think it would be helpful if Naser could establish deliverables, milestones, and timelines for some of his activities.  In this way, his efforts can be integrated directly into project teams, maximizing the impact and minimizing confusion that can arise. . . . I see these activities as gaps in these projects that will greatly inhibit the development and implementation of [the projects] and should be remediated in 2019.  These activities are keeping in line with R4 level work expectations.  Naser has meet [sic] expectations for 2018; however, for 2019, I am

looking for greater speed in implementation and communication on his projects to the broader organization.

Naser and I decided that serving as the technical lead is no longer a productive activity for him.  This will free him up to make greater progress on the initiatives described above.

[Filing No. 44-2 at 13.]

### L.  Mr. Iacocca's May 2019 Reports to ER

On May 1, 2019, Mr. Iacocca contacted ER to discuss "performance concerns" concerning Mr. Hineiti.  [Filing No. 44-8 at 28.]  The ER record of that conversation outlined various concerns, including the following:

- Mr. Hineiti "was taken out of [a previous] role due to ineffectiveness/inappropriate interactions";

- "[Mr. Hineiti] does not want to work on a project, just wants to oversee"; and

- "[Mr. Hineiti d]oes not work well with others in the organization, not driving ideas/payoff to the business."

[Filing No. 44-8 at 28.]

### M. Mr. Hineiti's 2019 Mid-Year Check-In

Mr. Hineiti's 2019 mid-year evaluation reflects that he was focusing on four specific "areas of activity," and while "the scope of the work is well done for its intended purpose," the "timeline has been slow."  [Filing No. 44-2 at 14.]  The evaluation also indicated that Mr. Hineiti "needs to be contributing individually to portfolio conversations," and that he "will be assigned these projects as they manifest."  [Filing No. 44-2 at 14.]

### N.  Mr. Hineiti's 2019 Application for a Promotion

Mr. Hineiti applied for a technical promotion for a second time in 2019.  [Filing No. 44-1 at 89-90.]  During the pre-voting stage, four members of the Title Team voted against Mr. Hineiti

receiving a promotion, and no members voted in favor.  [Filing No. 44-7 at 21.]  Mr. Iacocca

received feedback from the Titles Team, which included comments such as:

- "Candidate's focus appears to be on technology development and business process improvements, but major portfolio contributions expected for R4/R5 level are lacking";

- "Not operating at the current level of technical ladder";

- "Poor demonstration of collaborative mindset"; and

- "I do not believe the dossier reflects the level of organizational impact, talent mentoring, inclusive team development, external influence, agility, clearly measured results, or strategic execution commensurate with a R5 promotion."

[Filing No. 44-7 at 21.]

Mr. Hineiti was ultimately denied the promotion by a unanimous vote of the Titles Team

on September 23, 2019.  [Filing No. 44-3 at 70.]  He testified that he was told that he was denied

the promotion because he did not have enough experience with portfolio projects.  [Filing No. 44-

1 at 94.]  However, he maintains that he sought portfolio work from Mr. Ratz and Mr. Iacocca but

was never given any.  [Filing No. 44-1 at 94-95.]

### O.  Mr. Hineiti Files his Second Charge of Discrimination with the EEOC

On September 30, 2019, Mr. Hineiti filed his second charge of discrimination with the

EEOC ("the September 2019 Charge").  [Filing No. 44-2 at 15-16.]  The charged alleged

discrimination and retaliation based on race, color, national origin, and age.  [Filing No. 44-2 at

15.]  In the September 2019 Charge, Mr. Hineiti alleged that his filing of the November 2015

Charge "was protected activity under Title VII."  [Filing No. 44-2 at 15.]  He further alleged that

Lilly "continued to hire less qualified American and/or significantly younger individuals to

positions to which it had not permitted [him] to apply," and that the hiring manager involved in

those decisions was Mr. Ratz.  [Filing No. 44-2 at 15.]  In addition, Mr. Hineiti alleged that he was

denied transfers and promotions, lost his direct reports, was given lower than average raises, and was denied opportunities to perform the portfolio work required for advancement.  [Filing No. 44-2 at 15-16.]

**P.  Mr. Hineiti's 2019 Year-End Evaluation**

At the end of 2019, Mr. Iacocca indicated that Mr. Hineiti did not "sufficiently [meet] job expectations for the performance period." [Filing No. 44-2 at 19.]  Mr. Iacocca noted that one of Mr. Hineiti's presentations concerning a project "didn't meet expectations" because the presentation "didn't make a clear description of the project, resources required, and the impact it would have.  It needed to be revised as it was very wordy and tutorial." [Filing No. 44-2 at 19.]

Mr. Iacocca also noted that Mr. Hineiti was asked to help reduce manufacturing costs for a project and obtained a quote from a third party, but did not know that a contract with that party would require confidentiality agreements.  [Filing No. 44-2 at 19.]  Mr. Iacocca commented that "[f]or an R4 level engineering advisor, thoroughness and understanding of the business process is necessary for successful outcomes, and this effort didn't meet expectations." [Filing No. 44-2 at 19.]

Mr. Iacocca also explained that Mr. Hineiti had approached him about his compensation and possible continuing education opportunities without conducting the necessary investigation into those issues.  [Filing No. 44-2 at 19.]  Specifically, Mr. Hineiti had complained that his pay had remained unchanged for years, although that was not true.  [Filing No. 44-2 at 19.]  He also misstated that another employee was receiving a "Lilly MBA," when she was actually receiving a tuition reimbursement.  [Filing No. 44-2 at 19.]  Mr. Iacocca stated that Mr. Hineiti had not investigated this program at all, but instead had expected Mr. Iacocca to do so.  [Filing No. 44-2 at 19.]  In Mr. Iacocca's opinion, these issues "reflect[ed] a lack of completeness and [a] tendency

to act in a program-manager fashion, rather than making the business case for a request" and showed that Mr. Hineiti "operates in an isolated fashion." [Filing No. 44-2 at 19.]

Regarding his 2019 application for a promotion, Mr. Iacocca wrote that Mr. Hineiti reported that other employees were supportive of his candidacy, while some of those individuals approached Mr. Iacocca and stated that they did not support Mr. Hineiti's candidacy. [Filing No. 44-2 at 19.] Mr. Iacocca stated that he and Mr. Hineiti spent "a great deal of time" on his dossier and application, but Mr. Hineiti "didn't incorporate the provided feedback and then was upset with the decision." [Filing No. 44-2 at 19.] Mr. Iacocca noted that denial of a promotion in two consecutive years was "not a desirable situation." [Filing No. 44-2 at 19.]

### Q. Mr. Hineiti is Reprimanded for his Behavior During a Presentation

In February 2020, Mr. Iacocca sent an email to Mr. Hineiti concerning his behavior during a presentation given by a candidate for employment. [*See* Filing No. 44-2 at 20-21.] The email stated that during the presentation, Mr. Hineiti asked the candidate questions in a way that resulted in "continual interruption" and "dominated the conversation on every side." [Filing No. 44-2 at 20-21.] The email stated that "two people commented on [Mr. Hineiti's] actions during the presentation and wondered why it happened," and noted:

> If you recall at year end, we talked about this behavior. Dave Collins commented on it directly in your interactions with the ongoing Purdue collaboration, and it was mentioned with respect to interviews conducted in the past. You have received feedback on this several times. Asking a few clarifying questions is one thing; however, to ask so many as to distracts [sic] the speaker and presents [sic] others from asking questions defeats the purpose of the presentation.

[Filing No. 44-2 at 21.]

Regarding this same incident, Mr. Iacocca received an email in February 2020 from the Director of Mechanical Engineering in DDCS. [Filing No. 44-7 at 24.] In relevant part, the email stated:

14

I would like to express my disappointment at some behavior I observed towards the potential candidate presenting a seminar during his interview on Friday 21 February 2020. The candidate[] . . . was subjected to a line of questioning during his talk by Naser Hineiti that I found inappropriate, excessively diminutive, and unbecoming of the values we set forth to exemplify here at Lilly. On two separate occasions, the candidate was presenting technical work and Naser interrupted him to ask him a series of questions of which the tone was not what I would deem appropriate for an external candidate. In both cases, Naser's tone was rather forward and aggressive[.] . . . [I]t is embarrassing that we could potentially leave the impression to others outside our company that this is the way Lilly does business. This affects recruiting, retention, but at the core it does not align with proper respect for people and decorum in such an [sic] public interview seminar setting.

[Filing No. 44-7 at 24.]

### R.  Mr. Hineiti's Performance Improvement Plan

On March 23, 2020, Mr. Hineiti was placed on a performance improvement plan ("PIP"). [Filing No. 44-1 at 105-06; Filing No. 44-2 at 22.] The PIP identified the following three areas of "unacceptable performance": (1) "[n]ot meeting R4-level expectations"; (2) "[l]ack of application to portfolio work"; and (3) "[i]nsufficient development of less experienced engineers" through mentorship. [Filing No. 44-2 at 22.] As for the first area, the PIP noted that Mr. Hineiti: (1) proposed a two-year agreement to license a particular software at a cost of approximately $400,000 per year, without realizing that only one person was using that particular software; (2) was unable to clearly present his projects to management lead teams; and (3) requested $97,000 in software updates, failed to provide an alternative solution when the request was denied, and failed to realize that the contract that was ultimately signed required a three-way confidentiality agreement, all of which demonstrated his "inability to independently develop solutions by anticipating and managing risk to both the company and delivering the portfolio." [Filing No. 44-2 at 22-23.] Regarding his lack of application to portfolio work, the PIP noted that "[d]espite attempts to get [Mr. Hineiti] involved with portfolio projects, project managers and line supervision consistently decline after providing feedback," indicating that: (1) Mr. Hineiti assigned

tasks to other team members, rather than doing work himself; and (2) Mr. Hineiti was "disconnected from" management and had difficulty influencing decisions.  [Filing No. 44-2 at 23.]  As for his failure to mentor other engineers, the PIP stated that Mr. Hineiti claimed to have mentored three people, but "the feedback has repeatedly been that the relationships are not a mentoring one."  [Filing No. 44-2 at 23-24.]

The PIP required Mr. Hineiti to satisfy the following requirements to bring his performance to an acceptable level:

1.  Focus on portfolio needs. . . . [Y]ou must contribute directly to project deliverables[.]  Additionally, you have been working on DFX for approximately two years; therefore I expect to see more application of these concepts to portfolio projects, and not simply take on the role of project manager. . . . [Y]ou must prepare a business plan for these activities going forward, complete with timeline, deliverables, and expected financial benefits for DDCS.  You must spend at least 60% of your time assigned directly to portfolio projects beginning in May 2020. On a bi-monthly basis[,] . . . you are to prepare a summary of your efforts, the time expended, and the milestones that were achieved. You must also include plans for the next 15 days on the work you are planning to complete in that timeframe. . . .

2.  You must be able to demonstrate your ability to drive large portfolio-driven projects from concept to completion.  This involves a thorough understanding of the business case, the ability to communicate this to key stakeholders, and the ability to bring more less experienced members of the team along as progress is made. . . . You must prepare a presentation for the DDCS Lead Team to gain consensus on how DFX will be developed and used moving forward. This presentation should be put on the Lead Team calendar no later than March 30 and be delivered by April 30 (timing may change due to availability). Please work with the Operations team to schedule this.

3.  Demonstrate Team Lilly behaviors. As per the Global Policy on Conduct in the workplace: Employees must observe normal standards of courtesy, respect, and consideration in interacting with other employees and people with whom Lilly does business. Effective immediately, you must demonstrate this in your daily interactions by being less disruptive in meetings and allowing others to present their work/perspectives. I will be actively seeking feedback from your various teams and colleagues.

[Filing No. 44-2 at 24-25 (emphasis removed).]

Mr. Hineiti provided lengthy responses to each of the items and expectations addressed in the PIP.  [Filing No. 44-2 at 26-28.]  He repeatedly asserted that Mr. Iacocca's understanding of the facts was inaccurate.  [Filing No. 44-2 at 26-28.]  He also stated that he has been attempting "for years" to obtain more portfolio work.  [Filing No. 44-2 at 28.]  Mr. Hineiti then listed ten of his achievements over the course of his career at Lilly, and concluded by saying, "I do look forward to working on this plan with you as a mentor and a champion.  I am confident in my abilities, and the first to admit that I need to work on some gaps just like any other person."  [Filing No. 44-2 at 28-29.]

**S.  Mr. Hineiti Files a Third Charge with the EEOC**

In April 2020, Mr. Hineiti filed a third charge with the EEOC, alleging retaliation ("the April 2020 Charge").  [Filing No. 44-2 at 30.]  Specifically, Mr. Hineiti alleged that after he filed the September 2019 Charge, Lilly "continued to hire less qualified American and/or significantly younger individuals to positions to which it had not permitted [Mr. Hineiti] to apply."  [Filing No. 44-2 at 30.]  He alleged that Lilly retaliated against him by: (1) concluding during his year-end evaluation that he did not meet expectations despite positive feedback, resulting in his bonus being reduced by 50% and receiving no raise or equity; (2) removing him "as sponsor of lunch and learn seminars," and replacing him with a Caucasian American employee in her 30s; and (3) placing him on the PIP.  [Filing No. 44-2 at 31.]

**T.  Mr. Hineiti Receives a Final Written Warning**

On July 24, 2020, Mr. Hineiti received a Notice of Final Written Warning ("the Final Written Warning").  [Filing No. 44-2 at 32-34.]  The Final Written Warning was a response to Mr. Hineiti's "unacceptable performance" and listed three specific examples: (1) he failed to arrange a

17

meeting with the project lead team by March 30, 2020 and give the presentation by April 30, 2020, as required by the PIP; (2) he failed to create a business case for his project or create a way to measure its effectiveness; and (3) he "did not prepare the work summaries as outlined in the PIP document." [Filing No. 44-2 at 32.]  The Final Written Warning listed items that Mr. Hineiti needed to complete to bring his performance to an acceptable level, including presenting to the Director's Forum by August 21, 2020 and providing the bi-monthly progress reports to Mr. Iacocca as contemplated by the PIP. [Filing No. 44-2 at 33-34.]

Mr. Hineiti disagreed with the Final Written Warning and felt as though the goals established in the PIP were not achievable. [Filing No. 44-1 at 158.]  Mr. Hineiti testified that he reported his progress to Mr. Iacocca on a daily basis, by sending him emails containing PowerPoints, documents, snapshots, and copies of relevant emails. [Filing No. 44-1 at 64-65.]  He also stated that he "reached out to the guy that schedules the meetings for leadership, and [he] asked to be put on the meeting schedule as soon as possible," but ultimately was assigned a meeting date outside of the deadlines imposed by the PIP. [Filing No. 44-1 at 65; Filing No. 44-1 at 120-21.]  He testified that the presentation was eventually scheduled for September 2020, but he was terminated before he could give the presentation. [Filing No. 44-1 at 127.]

**U.  Mr. Hineiti's Internal Complaint Against Mr. Ratz and Mr. Iacocca**

On July 28, 2020, Mr. Hineiti sent an email to ER representative William Heath, with the subject "discrimination/retaliation." [Filing No. 59-2 at 5; Filing No. 59-2 at 22.]  The email outlined the ways in which Mr. Hineiti believed he had been discriminated and retaliated against, including Mr. Ratz and Mr. Iacocca: (1) reorganizing the department, taking Mr. Hineiti's direct reports, and failing to select him for a leadership position; (2) failing to give him work on portfolio

projects; (3) giving him a poor performance review and withholding the corresponding bonus and equity; and (4) placing him on the PIP.  [Filing No. 59-2 at 22-23.]

### V.  The August 5, 2020 Meeting and Feedback

On August 5, 2020, Mr. Hineiti led a presentation, and Mr. Iacocca asked the people on the call to provide feedback.  [Filing No. 44-7 at 36.]  Their comments included the following:

- "It was clear that [Mr. Hineiti] was not aligned with the rest of the DDCS members on the call.  Going forward, I would like him to take more initiative in providing the necessary information and allowing for internal discussion in advance of the meeting."  [Filing No. 44-7 at 35.]

- "One of my observations of the meeting is that while all of the functional directors . . . were on the same page regarding the approach to DFM in our organization, [Mr. Hineiti] was not. . . . [It] was not a professional look for our DDCS organization."  [Filing No. 44-7 at 36-37.]

- "I did not fully understand the goal going into this meeting and why we were meeting with the group that we were meeting with. . . . There was no agenda set up for the call."  [Filing No. 44-7 at 38.]

- "There was no clarity about the purpose of the meeting.  I was expecting a framing statement at the beginning of the meeting from [Mr. Hineiti] or an agenda but that did not happen. . . . The lack of preparation or 'room awareness' was appalling. . . . [T]his was perhaps the poorest display of leadership in a public forum by a DDCS R4 level engineer (or any level of engineer, honestly) and it made me and others in the room hang our heads in shame as DDCS leaders. . . . [I]t was a bad meeting unfortunately."  [Filing No. 44-7 at 38-39.]

Mr. Iacocca met with Mr. Hineiti to discuss this feedback.  [*See* Filing No. 44-7 at 41.]  Mr. Iacocca's notes from the follow-up meeting indicate that Mr. Hineiti "didn't take accountability for the miss on this meeting" and blamed another employee.  [Filing No. 44-7 at 41.]

### W. Mr. Hineiti's Termination

Mr. Hineiti was terminated on August 14, 2020.  [Filing No. 59-2 at 5.]  Mr. Hineiti testified that he was not told why he was being terminated and did not know who was responsible for making that decision.  [Filing No. 44-1 at 126.]

### X. This Lawsuit

Mr. Hineiti filed this lawsuit on May 12, 2020, alleging discrimination based on age, sex, race, and national origin, as well as retaliation.  [Filing No. 1.]  On September 30, 2020, Mr. Hineiti filed an Amended Complaint adding facts related to his termination and asserting claims for discrimination based on age, sex, race, and national origin, as well as retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA").  [Filing No. 28.]  In his subsequent Statement of Claims, Mr. Hineiti clarified that he is only pursuing his retaliation claims, specifically that Lilly "retaliated against him due to his complaints of discrimination, charges, and lawsuit, activity protected by Title VII and the ADEA, when it denied him a technical promotion and then issued him [PIP], a final written warning, and terminated him on August 14, 2020."  [Filing No. 40 at 1; *see also* Filing No. 60 at 1 n.2 (Mr. Hineiti acknowledging that he "does not proceed upon his underlying claims of discrimination").]

Lilly filed a Motion for Summary Judgment seeking judgment in its favor on all of Mr. Hineiti's remaining retaliation claims.  [Filing No. 44.]  That motion is fully briefed, [Filing No. 45; Filing No. 60; Filing No. 63], and ripe for the Court's decision.

### III.
### DISCUSSION

Lilly argues that all of Mr. Hineiti's retaliation claims fail as a matter of law.  [Filing No. 45 at 17-28.]  First, Lilly asserts that the denial of a promotion in 2019 was not retaliatory because: (1) Mr. Hineiti did not complain about age discrimination prior to being denied a promotion, and therefore did not engage in protected activity under the ADEA; and (2) regardless, Mr. Hineiti cannot establish a causal connection between any protected activity and the denial of the promotion, because there is no suspicious timing, no evidence of others being treated differently,

and no evidence of pretext.  [Filing No. 45 at 17-22.]  Second, Lilly asserts that Mr. Hineiti's retaliation claim relating to being placed on a PIP cannot survive summary judgment because: (1) being placed on a PIP is not an adverse employment action; and (2) Mr. Hineiti cannot establish any causal connection between protected activity and the PIP.  [Filing No. 45 at 22-25.]  Third, Lilly argues that the Final Written Warning was not retaliatory, because Mr. Hineiti cannot show a causal connection between protected activity and the Final Written Warning.  [Filing No. 45 at 25-26.]  Finally, Lilly contends that any retaliation claim based on Mr. Hineiti's termination fails because he cannot establish a causal connection between protected conduct and the termination based on suspicious timing, comparator evidence, or pretext.  [Filing No. 45 at 26-28.]

In response, Mr. Hineiti first argues that he "suffered materially adverse actions."  [Filing No. 60 at 16.]  He notes that "[w]hile a [PIP] alone may not be materially adverse, one leading to a final written warning and termination may be," and contends that his "claims regarding [Lilly's] 2019 denial of a technical promotion; [Mr.] Iacocca's 2019 evaluation of his performance as does not meet expectations, resulting in the loss to [Mr.] Hineiti of half of the bonus he would otherwise have earned, a raise and equity; and his termination are all clearly materially adverse, and quantifiable in terms of pay and benefits."  [Filing No. 60 at 16.]  Mr. Hineiti further argues that there was a causal connection between his complaints of discrimination and the materially adverse actions taken against him, evidenced by suspicious timing, and "[t]he retaliation that [he] experienced was not one discrete event, but a series of actions which marginalized him in the [DDCS] community."  [Filing No. 60 at 17.]  Finally, Mr. Hineiti contends that Lilly's proffered non-discriminatory reasons for its actions are pretext, and that he presents evidence of suspicious timing and ambiguous statements, including "ambiguous statements from [Mr.] Iacocca regarding [Mr.] Hineiti's performance," as well as Lilly's "more favorable treatment of similarly situated

employees who had not complained of discrimination." [Filing No. 60 at 18-19.]  As examples of
"ambiguous statements," Mr. Hineiti points out that: (1) while Mr. Iacocca and Mr. Collins initially
encouraged his application for a promotion, they later "abandoned him"; (2) although Mr. Hineiti
was told he was denied a promotion because he did not have portfolio projects, his lack of portfolio
projects was out of his control as he repeatedly requested portfolio work but it was instead awarded
to his peers, and in any event portfolio work was not a requirement of promotion to the R5 level;
and (3) although one of the reasons for his Final Written Warning was his alleged failure to
communicate with leadership, Mr. Ratz had removed him from leadership meetings years before
and Mr. Hineiti continued to report on every project he was working on.  [Filing No. 60 at 18-19.]
Mr. Hineiti contends that these matters are sufficient to permit a reasonable jury to conclude that
Lilly's stated reasons for its actions are pretextual.  [Filing No. 60 at 19.]

        In reply, Lilly reiterates its argument that Mr. Hineiti has not identified any issue of
material fact as to whether a causal connection exists between any protected activity and any
allegedly adverse action.  [Filing No. 63 at 6.]  Lilly argues that the PIP and Final Written Warning
were not adverse actions because they did not affect Mr. Hineiti's pay or have any other tangible
impact on his employment and did not dissuade him from engaging in further protected activity.
[Filing No. 63 at 6-8.]  Lilly maintains that the timing of Mr. Hineiti's protected activities relative
to the disciplinary actions taken against him is in no way suspicious—for example, four years had
elapsed between the November 2015 Charge and the denial of the promotion in 2019—and in any
event, suspicious timing alone is insufficient to raise an inference of discrimination.  [Filing No.
63 at 8-9.]  Lilly further argues that any claim of suspicious timing is negated by the fact that Mr.
Hineiti's work performance was unsatisfactory—which he does not directly dispute—and given
that he received consistently negative feedback, he "simply cannot show that Lilly took any actions

against him based upon the timing of his protected activity." [Filing No. 63 at 10.] Additionally, Lilly contends that Mr. Hineiti has not identified any similarly situated individuals who were treated differently. [Filing No. 63 at 10-12.] Finally, Lilly argues that Mr. Hineiti's reliance on "ambiguous statements" is without merit because the three matters he relies upon "are not ambiguous nor are they 'statements,'" and in any event they do not demonstrate pretext because: (1) his alleged lack of portfolio work is immaterial; (2) his alleged removal from senior leadership meetings starting in 2015 had no bearing on his Final Written Warning; and (3) Mr. Iacocca's support or lack thereof for his 2019 promotion application had no connection to his previous protected activity. [Filing No. 63 at 12-15.]

### A.  General Standard for Retaliation Claims

In order to succeed on a retaliation claim under Title VII or the ADEA, Mr. Hineiti must produce evidence from which a reasonable jury could conclude that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 748 (7th Cir. 2021) (Title VII); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (ADEA). Title VII and the ADEA "share similar analytical approaches—*McDonell Douglas* [*v. Green*, 411 U.S. 792 (1973),] and *Ortiz* [*v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)]—at summary judgment." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). Under *Ortiz* and its progeny, "the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge [or other adverse action]?'" *Id.* at 959 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) ("[I]n retaliation cases [under the ADEA], we ask 'whether

the evidence would permit a reasonable factfinder to conclude' that the plaintiff's age 'caused the discharge or other adverse employment action.'").[1]

### B.  Protected Activities

Mr. Hineiti identifies the following protected activities: (1) the November 2015 Charge, the September 2019 Charge, and the April 2020 Charge filed with the EEOC; (2) the filing of this lawsuit on May 12, 2020; and (3) his July 2020 internal complaint.  [Filing No. 60 at 17.]  Lilly argues that the November 2015 Charge does not constitute protected activity under the ADEA because it did not mention discrimination based on age.  The Court agrees.  *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (explaining that in order for complaints to constitute protected activity under the ADEA, "they must include an objection to discrimination on the basis of age."); 29 U.S.C. § 623(a), (d) (prohibiting age-based discrimination and retaliation against any individual who "has opposed any practice made unlawful by this section").  However, Lilly does not dispute that Mr. Hineiti's other actions constitute protected activities.  Accordingly, the Court concludes that the November 2015 Charge constitutes a protected activity for purposes of Title VII only, and the remaining activities constitute protected activities for purposes of both the ADEA and Title VII.

### C.  Adverse Employment Actions

In his Statement of Claims, Mr. Hineiti asserts that Lilly retaliated against him when it: (1) denied him a technical promotion in 2019; (2) placed him on the PIP; (3) issued the Final Written Warning; and (4) terminated him.  [Filing No. 40 at 1.]  Although Mr. Hineiti mentions other allegedly adverse employment actions in his response brief—including his negative

---

[1] Because Mr. Hineiti does not utilize the *McDonnell Douglas* burden-shifting framework, the Court need not recount it here.

performance review at the end of 2019, [Filing No. 60 at 16]—the Court finds that Mr. Hineiti has abandoned all theories of retaliation not preserved in his Statement of Claims and therefore will not consider the adverse actions identified for the first time in the response brief as raising separate retaliation claims. *See Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (affirming the district court's conclusion that the plaintiff had abandoned a theory of recovery not asserted in his Statement of Claims).

In addition, Lilly argues that neither the PIP nor the Final Written Warning constitute a materially adverse employment action. [Filing No. 63 at 6-8.] The Court need not resolve this issue, however, because even assuming that the PIP and Final Written Warning constitute adverse actions, for the reasons explained below, Mr. Hineiti has failed to present evidence from which a reasonable factfinder could infer a causal connection between any protected activity and any purportedly adverse action.

### D. Causation

Under both the ADEA and Title VII, the plaintiff must establish that desire to retaliate was the but-for cause of an adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *McDaniel*, 940 F.3d at 371 (plaintiff bringing ADEA retaliation claim "needed to demonstrate that retaliation was the 'but-for' cause of the adverse action, 'not merely a contributing factor'") (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011)). Evidence from which a jury can infer causation "may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

"Under most circumstances, suspicious timing alone does not create a triable issue on causation . . . ." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014). "The mere fact that one event preceded another does nothing to prove that the first event caused the second," and therefore generally "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, [the Seventh Circuit] typically allow[s] no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Furthermore, the Seventh Circuit has recognized that an employee's protected activity "does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior." *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (internal quotations and citations omitted) (alteration original). Accordingly, where a "significant intervening event" separates an employee's protected activity from the adverse action, "a suspicious-timing argument will not prevail." *Id.*

To demonstrate pretext, a plaintiff must show that "the defendant's explanation is unworthy of credence." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008)). "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 620 (7th Cir. 2005)).

Turning first to Mr. Hineiti's assertion that the timing of the adverse actions relative to his complaints of discrimination is suspicious and therefore raises an inference of retaliation, the following timeline is instructive:

26

| Date | Protected Activity | Adverse Employment Action |
|------|-------------------|--------------------------|
| November 2015 | The November 2015 Charge | |
| September 2019 | | Mr. Hineiti is denied a promotion |
| September 30, 2019 | The September 2019 Charge | |
| March 23, 2020 | | Mr. Hineiti is placed on the PIP |
| April 14, 2020 | The April 2020 Charge | |
| May 12, 2020 | Mr. Hineiti files this lawsuit | |
| July 24, 2020 | | Final Written Warning |
| July 28, 2020 | Internal Complaint of Discrimination and Retaliation | |
| August 14, 2020 | | Mr. Hineiti is terminated |

There is nothing inherently suspicious about this timeline. Mr. Hineiti has presented no evidence from which a factfinder could conclude that the November 2015 Charge motivated any subsequent actions taken against him. Significantly, that charge was filed approximately four years prior to the September 2019 denial of a promotion, and during that time Lilly documented numerous concerns with Mr. Hineiti's workplace conduct and job performance, as exhibited by internal emails from Mr. Iacocca to ER, the 2017 talent assessment, year-end evaluation, and feedback from the unsuccessful promotion application in 2018. Simply put, there is no evidence whatsoever connecting the November 2015 Charge to any subsequent action against Mr. Hineiti.

Similarly, the remainder of the timeline is not suspicious for purposes of demonstrating retaliatory motive. Nearly six months elapsed between the filing of the September 2019 Charge and Mr. Hineiti's placement on the PIP. He was given the Final Written Warning approximately three months after the April 2020 Charge and more than two months after filing this lawsuit. And two and a half weeks elapsed between the July 28, 2020 internal complaint and Mr. Hineiti's termination. These time periods are all "more than a few days," and therefore too long to create an inference of retaliation under Seventh Circuit precedent, absent other evidence of a retaliatory

motive.  *See Kidwell*, 679 F.3d at 966.  Furthermore, significant intervening events separate Mr. Hineiti's protected activities from any adverse employment actions.  For example, Mr. Hineiti does not dispute that he received a negative performance evaluation at the end of 2019, which detailed several instances of unsatisfactory job performance; that he was reprimanded for his behavior during the February 2020 presentation; that he did not fulfill the requirements of the PIP; or that he performed unsatisfactorily at the August 2020 meeting.

Mr. Hineiti has not put forth other evidence creating a genuine issue of fact as to causation. Although Mr. Hineiti generally asserts that "similarly situated employees who had not complained of discrimination" were treated "more favorabl[y]," [Filing No. 60 at 19], he does not identify any particular employee or demonstrate that they are in fact similarly situated.  The Court need not and will not scour the record for facts about these potential comparators, and Mr. Hineiti's conclusory assertion does nothing to raise a factual issue concerning whether there is a causal connection between his protected activity and any adverse action taken against him.

Mr. Hineiti's pretext arguments are similarly deficient.  Although he asserts that he was denied the 2019 promotion because of a lack of portfolio work but that his lack of such work was out of his control, he does not dispute Lilly's evidence showing that he was denied portfolio work because others found him difficult to work with, or that several other factors contributed to the denial of his application for a promotion.  In any event, he presents no evidence connecting his lack of portfolio projects to a discriminatory or retaliatory motive.  The fact that Mr. Iacocca and Mr. Collins initially supported Mr. Hineiti's application for the promotion but then withdrew their support is also of no importance to Mr. Hineiti's retaliation claims because there is no evidence connecting the withdrawal of support to the ultimate denial of the promotion, or to any other adverse action, and there is no evidence demonstrating that their support was withdrawn for some

retaliatory or discriminatory reason.  Finally, Mr. Hineiti's argument that he was removed from senior leadership meetings is irrelevant because it was not a requirement of the Final Written Warning that he attend such meetings.  Further, Mr. Hineiti does not dispute that he did not comply with other requirements of the Final Written Warning.

"An employee may weave together a pattern of many different actions which together would constitute circumstantial evidence of discrimination, such that a reasonable jury could find a causal connection between the protected activity on the part of the employee and the retaliatory conduct on the part of the employer," *Formella*, 817 F.3d at 516, but "a speculative inference does not an employment discrimination case make," *Igasaki*, 988 F.3d at 961.  Here, Mr. Hineiti has presented no evidence from which a reasonable factfinder could infer that any of the adverse actions taken against him were connected to or motivated by his statutorily protected activities. His own speculation that they were causally connected is not enough.  Accordingly, Lilly's Motion for Summary Judgment is **GRANTED**.

### IV.
### CONCLUSION

Based on the foregoing, Lilly's Motion for Summary Judgment, [44], is **GRANTED**.  Final judgment shall issue accordingly.

Date: 11/9/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**

29